Eugene Richardson and Anna W. Richardson, husband and wife, et al. [1] v. Commissioner. Richardson v. Commissioner
Docket Nos. 47539, 47540, 48256, 59765. 2.
United States Tax Court
T.C. Memo 1957-122; 1957 Tax Ct. Memo LEXIS 140; 16 T.C.M. (CCH) 518; T.C.M. (RIA) 57122; June 28, 1957
Gerard Hartzog, Esq., 173 Broad Street, Charleston, S. C., and Elden McFarland, Esq., for the petitioners. George W. Calvert, Esq., and F. L. Van Haaften, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined deficiencies and additions to tax in the petitioners' income taxes as follows: Sec. 293(b)
Docket No.
Year
Petitioner
Deficiency
addition to tax
47539
1948
Eugene and Anna W. Richardson
$ 4,225.82
$ 2,112.91
47540
1942
Eugene Richardson
$ 1,330.74
$ 665.37
1943
Eugene Richardson
577.22 *
288.61
1944
Eugene Richardson
2,123.39
1,061.70
1945
Eugene Richardson
4,077.46
2,129.18 [2]
1946
Eugene Richardson
21,822.16
10,911.08
1947
Eugene Richardson
14,211.32
7,105.66
$44,142.29
$22,161.60
59765
1942
J. W. Richardson, deceased
$ 1,644.83
$ 822.42
1943
J. W. Richardson, deceased
487.77 *
510.34 [2]
1944
J. W. Richardson, deceased
2,011.30
1,079.29 [2]
1945
J. W. Richardson, deceased
4,095.98
2,098.27 [2]
1946
J. W. Richardson, deceased
21,980.11
10,990.06
1947
J. W. Richardson, deceased
14,245.23
7,122.61
1948
J. W. Richardson, deceased
6,380.61
3,190.31
$50,845.83
$25,813.30
*141 In Docket No. 48256, respondent determined the liability of Eugene and Anna W. Richardson, as transferees, for the following deficiencies and additions to tax of Richardson Brothers, Inc. Sec. 293(b)
Year
Tax
Deficiency
addition to tax
1942
Income
$ 3,644.81
$ 2,152.16 [3]
1942
Declared value excess-profits
1,370.96
685.48
1942
Excess profits
25,226.40
9,153.64 [3]
1943
Excess profits
4,324.90
2,162.45
1944
Declared value excess-profits
232.89
116.45
1944
Excess profits
15,038.18
7,519.09
$49,838.14
$21,789.27 In Docket Nos. 47539 and 47540 the deficiency notices were mailed by respondent on January 7, 1953, while in Docket Nos. 48256 and 59765 they were mailed on February 13, 1953, and August 18, 1955, respectively. All the returns involved herein were timely filed except certain amended returns. Richardson Brothers, Inc., filed *142 with the respondent waivers of the statute of limitations covering the years 1942, 1943, and 1944. Similar waivers were filed by the individual petitioners covering the years 1946, 1947, and 1948. By amendments to answers to amended petitions, the respondent added additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for a substantial underestimation of estimated tax for the year 1947 in Docket Nos. 47540 and 59765 in the amounts of $1,267.35 and $1,278.55, respectively. The issues for decision are: (1) Did Richardson Brothers, Inc., a corporation, Richardson Brothers, a partnership and successor in interest to the corporation, Eugene Richardson, and J. W. Richardson, all understate their income for the years 1942 through 1948, or were the alleged unreported amounts paid out as commissions or kickbacks to foreign ship captains; (2) was any part of the deficiencies resulting from the alleged unreported amounts due to fraud with intent to evade tax; (3) are the determinations for the years 1942 through 1945 of both Eugene's and J. W.'s income barred by the statute of limitations; (4) was the corporation's and partnership's inventory grossly understated for *143 the years in question; (5) did Eugene and J. W. take goods out of the firm's inventory for their personal use; (6) was the deduction of $2,500, representing accounting fees, taken in the fiscal year 1944 properly disallowed; (7) are Eugene and Anna W. Richardson liable for the corporation's additional income taxes as transferees of the corporation's assets; (8) did Eugene and J. W. receive additional compensation from the corporation in 1942; (9) are Eugene and J. W. subject to 294(d)(2) additions to tax for substantial underestimation of their 1947 estimated income tax; and (10) did the respondent properly disallow certain deductions taken by Eugene and J. W. during the years here at issue. The respondent has conceded error in his determination that the corporation's capital stock tax deductions were incorrect. The respondent also concedes that the corporation's opening inventory for the fiscal year 1942, as shown on its return, should be multiplied by the same figure used in adjusting the closing inventory for that year. Findings of Fact Some of the facts are stipulated. The stipulation and the exhibits annexed thereto are incorporated herein by this reference. Petitioners *144 Eugene Richardson (hereinafter referred to as Eugene) and Anna W. Richardson are husband and wife. Eugene and petitioner J. W. Richardson, his brother (hereinafter referred to as J. W.), were in business together, first as stockholders and officers in Richardson Brothers, Inc. (hereinafter referred to as the corporation) and then as partners in Richardson Brothers, a partnership (hereinafter referred to as the partnership), successor in interest to the corporation. (The corporation and its successor partnership will hereinafter be referred to collectively as the firm.) J. W. died sometime after January 7, 1951, and Eugene appears herein as the executor of his estate. Petitioners all reside in Charleston, South Carolina. Their respective tax returns were timely filed with the then Collector of Internal Revenue at Columbia, South Carolina. Both the corporation and the partnership filed their returns on a fiscal year basis ended November 30. The individual petitioners all filed their returns on a calendar year basis. Eugene and J. W. started a ship chandlering business in Charleston in 1920. In 1932 the corporation was organized under the laws of the State of South Carolina. During *145 all the years relevant herein, Eugene was president of the corporation and J. W. was its secretary-treasurer. During this period, the corporation had outstanding 50 shares of capital stock with a par value of $100 per share. As of November 30, 1944, the stock was held as follows: No. of
Shares
Eugene Richardson
1
Anna W. Richardson
24
J. W. Richardson
1
Mrs. Lucia Glover
24
The corporation's books were kept on an accrual basis. It ceased operations as of the close of business on November 30, 1944. On December 1, 1944, the partnership purchased certain of the corporation's assets, assumed certain of its liabilities, and continued in the ship chandlering business using the same premises that the corporation had used and employing the same people that the corporation had employed. During the years in question the firm was one of the largest ship chandlers in Charleston. At the time of the hearing, the business was still being carried on by Eugene. The ship chandlering business consists of supplying ships with the equipment and stores that they require. These supplies are of three main types: deck supplies, engine supplies and parts, and steward's supplies *146 (provisions and groceries.) In addition, the firm sold water to various ships and the United States Navy Yard at Charleston and also hired out its launches for various purposes. When a ship enters or is about to enter port, the ship's agent in that port notifies the chandler who has previously dealt with the ship or, if it is a new arrival, notifies more than one chandler. Each chandler wishing to supply the ship sends his representative to talk with the ship's captain as soon as the ship is anchored. Such representative is called a "runner." J. W. was the runner for the firm during the years here involved. Eugene was in charge of the office and filling the orders received from J. W. Eugene did all the ordering, priced the sales invoices, supervised the office staff, and had general management of all phases of the business except the "running" which was carried on by J. W. If the goods ordered by Eugene to fill the ship's order constituted full truckloads, they were delivered directly to one of the firm's launches and then taken out to the ship. If the goods so ordered were less than full truckloads they were delivered to the firm's premises, then taken by the firm's truck to *147 one of the launches, and then to the ship. J. W. was on hand when the completed order was taken to the ship. Deliveries onto foreign ships, and other ships clearing for foreign ports, must first be cleared through customs. Upon delivery of the supplies on board ship they are checked against the invoices and verified and a ship's officer then approves the invoice by signing the same. The steward usually checks over and approves the portion thereof covering provisions delivered to his department, the chief engineer or captain approves the portion of the invoice for engine supplies, and the captain or first mate may approve the portion of the invoice for deck supplies. The captain alone may approve the entire invoice. Captains of foreign ships receive less pay than captains of American ships. To bolster their relatively low salaries, it has been a longstanding custom for captains of foreign ships to demand and receive commissions or kickbacks from various ship chandlers. Foreign ship owners and their local agents are aware of this practice. The usual commission is 5 per cent of the total order received by the chandler, although the commission might vary slightly in proportion to *148 the amount of competition for the ship's business. The amount of the commission is established by prior business dealings with the ship or between the captain and the runner when the order is given. The ship's captain makes the final decision as to which chandler will get the order. Occasionally, smaller gifts are given to the chief steward and chief engineer of a ship if supplies for their departments are involved. These commissions are usually paid in cash, aboard the ship. The commissions were recouped by chandlers when the invoices for goods delivered to the ships were paid by the ship owners or their agents. The commissions never appeared as a separate item on the invoice but were spread over the entire bill. During World War II the War Shipping Administration sought to prohibit payment of commissions to officers and personnel of any vessels, the cost of operation of which was paid out of Federal lend-lease funds. This order, Food Control Regulation No. 3, was issued on October 27, 1943, and revoked January 4, 1946. After the war, approximately 65 per cent of the ships entering the port of Charleston were foreign ships. During the war the proportion of foreign ships entering *149 the port of Charleston was smaller and amounted to 50 per cent of all ships entering that port. On occasion, petitioners would advance cash to a ship's captain to cover the ship's needs while in port if the need arose after banking hours. Petitioners also advanced cash to their employees who were requested by crew members to purchase specific items for the crew members in Charleston shops. When the goods were delivered on board ship, the crew members reimbursed petitioners. All cash advances made for or to the ship or its crew members were repaid to petitioners. The books and records of the firm consisted of ship's folders, a "blotter" book, a sales journal, a cash journal, an accounts receivable ledger, and a general ledger. The ship's folders contained copies of all invoices of goods sold to the ship, plus receipted bills for all merchandise purchased by the firm's employees for individual crew members. The alleged commission or kickback paid to each captain was noted by Eugene in his own handwriting either on the typewritten invoice itself or on a scrap of paper attached to the invoice in the ship's folder. These alleged commissions appeared nowhere else on the firm's records *150 and, as thus noted by Eugene, were in amounts which had no pattern of percentage proportion to the amounts of the invoices billed to the ship. When goods were ready to be delivered to a ship, Eugene would dictate the invoices and prices to be placed thereon to his secretary. The invoices were then entered in the "blotter" book by the secretary. This book was never totaled nor cross-checked with the other books. From the blotter the bookkeeper entered the invoices into the sales journal, then posted to the accounts receivable ledger and the general ledger. Cash sales were recorded by the bookkeeper in the cash journal, then posted to the general ledger. Eugene received all of the firm's mail. He gave any checks received in payment of invoices to the bookkeeper who entered them in the cash journal and then posted them to the accounts receivable ledger and general ledger. Cash payments of discounts and various cash advances were often made after banking hours and on weekends. Eugene kept a cash fund in a separate safe in his office. As the fund was depleted, or as the expectancy of large payments in the near future grew, Eugene would replenish the fund by having certain of the *151 checks received in payment of invoices cashed. Neither the checks cashed nor the invoices for which they represented payment were ever recorded on the firm's books. Eugene would decide beforehand what amounts would be needed to replenish his fund and would withhold an invoice in that approximate amount from the bookkeeper. When a check in payment was received, he would endorse the check in the firm's name and send it to the bank to be cashed. The cash was returned to him and placed by him in his office safe. In some cases, only a part of a check was put in Eugene's fund. In those instances, the balance of the check was turned over to the bookkeeper and recorded on the books either as a cash sale or as a credit to accounts receivable if that part of the invoice had been recorded as a credit sale. J. W. was aware of this method of replenishing the cash fund and the transactions incident thereto. In the course of their investigation, respondent's agents contacted the firm's customers and received copies of all checks sent to the firm in payment of invoices during the years involved. The following checks were cashed by the firm and not entered on its books and records: Fiscal Year Ended November 30, 1942.
Amount
of Sale
Number
Omitted
of
from
Drawer
Checks
Records
Carolina Shipping Co.
1
$ 2,000.00
Fiscal Year Ended November 30, 1943.
Socony-Vacuum Oil Co., Inc.
11
$ 390.72
Meddin Bros.
1
650.99
Total
12
$ 1,041.71
Fiscal Year Ended November 30, 1944.
Meddin Bros.
4
$ 2,672.11
Carolina Shipping Co.
3
3,549.27
Socony-Vacuum Oil Co., Inc.
9
2,365.37
Total
16
$ 8,586.75
Fiscal Year Ended November 30, 1945.
Socony-Vacuum Oil Co., Inc.
12
$ 4,185.70
Carolina Shipping Co.
3
5,921.52
Total
15
$10,107.22
Fiscal Year Ended November 30, 1946.
Socony-Vacuum Oil Co., Inc.
13
$ 2,539.36
Carolina Shipping Co.
5
19,612.89
Street Bros.
4
15,373.10
Standard Oil Co. of N.J.
3
9,703.28
Total
25
$47,228.63
Fiscal Year Ended November 30, 1947.
Socony-Vacuum Oil Co., Inc.
12
$ 3,206.33
Carolina Shipping Co.
2
7,690.52
Palmetto Ship Chandling Co.
15
27,906.59
Street Bros.
1
2,794.89
Total
30
$41,598.33
Fiscal Year Ended November 30, 1948.
Socony-Vacuum Oil Co., Inc.
11
$ 1,177.96
Palmetto Ship Chandling Co.
5
5,523.55
Standard Oil Co. of N.J.
7
4,471.55
Street Bros.
8
7,171.25
Meddin Bros.
1
28.25
CarolinaShipping Co.
2
1,255.26
Total
34
$19,627.82
*152 Richardson Brothers, Inc., paid commissions to captains and other officers of foreign ships in the taxable years 1942, 1943, and 1944, in the respective amounts of $5,878.74, $4,592.56, and $7,186.15. The partnership of Richardson Brothers paid such commissions in the taxable years 1945, 1946, 1947, and 1948, in the respective amounts of $10,116.16, $10,429.68, $10,169.47, and $5,631.43. Such payments either constituted adjustments of the sales prices received by the corporation and the partnership, or were deductible ordinary and necessary business expenses. Eugene and J. W. had little formal education. They were experienced business men but knew little or nothing about bookkeeping and the keeping of formal records. Throughout the years in question, they relied on their bookkeeper and accountant in matters of keeping the books. C. L. Vann, a certified public accountant, was the accountant for all of the petitioners for the years 1942 through 1946. He, or one Craig, an employee of his, prepared the returns for all petitioners for 1942 through 1946, as well as the declaration of estimated tax for Eugene and J. W. for the calendar year 1947. J. H. Furman, the accountant who *153 succeeded Vann in 1947, made the subsequent audits and prepared the returns for petitioners for 1947 and 1948. Petitioners accepted the returns as prepared and never questioned them. It was Vann's practice to have the books sent to his office whenever any work was necessary. Occasionally, Craig worked on the books at the firm's premises. Vann, Graig, and Furman were all acquainted with the custom of paying commissions or kickbacks and never questioned this practice. Neither Vann, Craig, nor Furman ever inspected the ship's folders even though they were available at the firm's premises. For the fiscal years 1942 through 1946, Vann used the figures shown on the firm's books in preparing the various returns. For the fiscal years 1942 through 1944, a summary check of the books was made, but the original entries and invoices were not verified. For the fiscal years 1945 and 1946, Vann made a limited audit, verifying the internal correctness of the books but not checking the original entries. For the years 1947 and 1948, Furman checked the internal accuracy of the books, but did not verify the original entries. He used the figures shown on the firm's books in preparing the various returns. *154 A part of the deficiencies owed by the individual taxpayers for each of the taxable years 1946 to 1948, inclusive, is due to fraud with intent to evade tax. During the years in question, the firm's inventory of deck and engine supplies consisted of such items as porthold glasses, rat guards, chains, and galvanized hooks. Much of the inventory was obsolete and had been on hand for a number of years. A major portion of it had been purchased by Eugene from the Government as war surplus after World War I for from 2 1/2 to 5 per cent of its original cost to the Government. After 1940 the firm kept no inventory of food or steward's supplies. All food or steward's supplies and most of the deck and engine supplies ordered by the firm's customers were purchased by Eugene when the orders were received. Each year, in December, the firm's employees took a physical count of the inventory and Eugene priced it. Occasionally, when the volume of business at that time was high, no physical inventory was taken and the previous year's figures were carried over. The prices supplied by Eugene were, to the best of his knowledge, the cost or current market value of the supplies on hand, whichever was *155 lower. In its tax return for the fiscal year 1944, the corporation took a deduction for an accounting fee in the amount of $2,500, representing the claim of Vann for accounting work done on claims for relief by the corporation under section 722. He considered this amount to be due and owing to him as of November 30, 1944, regardless of the outcome of the claim. The $2,500 has not been paid. In Docket No. 48256, respondent determined transferee liability against Eugene and Anna for the deficiencies determined to be due from the corporation. At the close of business on November 30, 1944, the corporation ceased business and thereafter was dissolved. Eugene acted as liquidating trustee in collection and distribution of its assets. The corporation's assets, liabilities, and capital as of November 30, 1944, without considering the tax liabilities here at issue, were as follows: Assets
Cash
$ 6,060.78
Accounts Receivable
23,343.83
Inventory
989.56
Auto Equipment
781.25
Boat Equipment
3,838.08
Office Fixtures
19.67
U.S. Bonds
9,678.00
Special Bank Account
14,000.00
Unexpired Insurance
531.67
Total Assets
$59,242.84
Liabilities and Capital
Accounts Payable
$11,791.31
Accrued Salaries
353.07
Accrued Taxes: State Income
$ 945.83
U.S. Income and Ex-
cess Profits
9,009.45
Social Security and
Withholding
790.73
10,746.01
Capital Stock
$ 5,000.00
Paid-in Surplus
1,729.25
Earned Surplus
29,623.20
36,352.45
Total Liabilities and Capital
$59,242.84
*156 On December 1, 1944, the partnership purchased certain assets and assumed certain liabilities of the corporation, paying therefor $9,102.52 in November 1946. The following schedule shows the assets and liabilities taken over by the partnership and those retained by the trustee in liquidation: Assets
Transferred
Retained
Cash
$ 6,060.78
Accounts Receivable
$23,343.83
Inventory
989.56
Auto Equipment
781.25
Boat Equipment
3,838.08
Office Equipment
19.67
Special Bank Account
14,000.00
U.S. Bonds
9,678.00
Unexpired Insurance
531.67
Total
$29,504.06
$29,738.78
Liabilities
Accounts Payable
$11,791.31
Accrued Salaries
353.07
Accrued Taxes: State Income
$ 945.83
U.S. Income and Ex-
cess Profits
9,009.45
Social Security and
Withholding
790.73
$12,935.11
$ 9,955.28
Net Assets Transferred
and Retained
$16,568.95
$19,783.50
Subsequently, Eugene, acting as liquidating trustee for the corporation, liquidated the retained assets of the corporation into its special bank account as follows: Dec. 1, 1944 - Balance
$14,000.00
Dec. 30, 1944 - Cash deposited
6,060.78
Nov. 6, 1946 - Payment by partner-
ship
9,102.52
May 7, 1947 - Post-war Refund Credit
541.57
Dec. 16, 1947 - Post-war Refund Credit
404.44
Dec. 8, 1948 - Deposit
373.78
Jan. 5, 1949 - Proceeds of U.S.
bonds, principal and
interest
10,489.50
Total cash to be distributed
$40,972.59
*157 From December 1944 to June 1950, Eugene, as liquidating trustee of the corporation, paid out of the special bank account $6,722.28 to creditors and $27,500 to stockholders. The stockholders received the following amounts: Mrs.
Eugene
Anna W.
J. W.
Glover
1944
$ 100
$2,400
$ 100
$2,400
1946
100
2,400
100
2,400
1948
200
4,800
200
4,800
1949
5,000
2,500
$5,400
$9,600
$2,900
$9,600
The balance of $6,750.31 remaining in the special checking account was seized by the respondent on January 30, 1953, under section 273(a) of the Internal Revenue Code of 1939. In his determination, respondent has determined transferee liability against Eugene and Anna to the extent of $6,250 and $9,600, respectively. In his determination, respondent has treated the distributions to Eugene and Anna in 1948 as capital gains and in this regard petitioners raise no question. Eugene and J. W. filed timely personal income tax returns for the calendar year 1942, showing salary of $3,820 each. Eugene and J. W. filed amended returns for 1942 on or about March 15, 1944, showing additional salaries of $3,380 and $3,338.30, respectively. No tax was *158 paid on account of this ncrease in income. Eugene and J. W. timely filed declarations of estimated tax due for the year 1947. The declarations, as prepared by Vann, showed total estimated tax due of $3,598.71 and $3,534.99, respectively, which was partially paid in three equal installments of $899.68 and $883.75, respectively. Their final tax returns for 1947, as prepared by Furman, were filed on January 9, 1948, showing total tax due of $9,610.16 and $9,715.20, respectively. The returns were accompanied by checks for $6,911.12 and $7,063.95, representing the balance of tax due after deduction of the three payments of estimated tax. In his determination, respondent disallowed the following deductions of both Eugene and J. W.: Year
Type
Amount
Eugene 1944
Medical
$248.12
1945
Miscellaneous
319.88
1946
Miscellaneous
352.27
J. W. 1942
Contributions
$340.00
1943
Contributions
150.00
1945
Contributions
174.20
1946
Automobile
500.80
Telephone
50.64
In his determination, respondent disallowed the exemption claimed by J. W. in 1942 and 1943 as a married person living with his wife, the dependency credit for a child claimed in 1942 and 1943, *159 and the dependency credit for his wife claimed in 1944. In his determination, respondent added capital gain to Eugene's income for 1945, 1946, and 1947 in the respective amounts of $42.25, $50, and $91.62. Opinion Issues 1, 2, and 3 KERN, Judge: These issues all involve the common question of the payment of commisions or kickbacks to officers of foreign ships by Richardson Brothers, Inc., or the partnership, Richardson Brothers, operating a ship chandler's business in Charleston, South Carolina. The respondent has determined that large sums of money were received by the corporation and the partnership during the taxable years which were not recorded on their books or included as receipts in their tax returns. Petitioners, in effect, concede such receipts but contend that equivalent amounts were paid out as commissions and, therefore, the amount of income reported in each taxable year was substantially correct. We are persuaded by the record herein that the corporation and the partnership followed the long-established custom of paying commissions to officers of foreign ships in the average amount of 5 per cent of the invoice price of goods sold to such ships, and that such *160 commissions constituted either ordinary and necessary business expenses, Frank J. Valetti et al., 28 T.C. - (No. 75, filed June 24, 1957), or adjustments of the sales prices set out in their invoices, Pittsburgh Milk Co., 26 T.C. 707. With regard to the amount of such commissions paid, we reject the evidence submitted by petitioners for the same reasons set out in the Valetti case, supra. We have concluded from the testimony of Eugene that 65 per cent of the sales of the partnership was to foreign ships, and have concluded that 5 per cent of such sales constituted commissions paid to the officers of such ship. As to the corporation which operated in the taxable years during the war, when, according to the testimony of Eugene, the percentage of foreign ships coming into the port of Charleston was less, we have concluded that 50 per cent of its sales were to foreign ships. As a result of our findings, it is apparent that the deductible, but not deducted, expenditures made in 1942, 1943, and 1944 by the corporation on account of such commissions and by the partnership in 1945 were in amounts in excess of or approximately equivalent to the amounts of its unrecorded and *161 unreported income. With regard to the corporation in years prior to 1945 and the partnership in 1945, we are unable to conclude that any deficiency in taxes is due to fraud with intent to evade tax. However, in the case of the partnership, the amount of its deductible, but not deducted, expenditures made on account of such commissions during the taxable years 1946 to 1948 is greatly less than the amount of its unrecorded and unreported income. The partners must have been aware of the discrepancy and their failure to return the true partnership income. For reasons similar to those stated by us in the Valetti case, supra, we have concluded that as to each of these years a part of the deficiencies is due to fraud with intent to evade tax. Contrary to the situation in the Valetti case, supra, respondent here argues that no part of the commissions paid can be allowed as a deduction since the payment of such commissions is in violation of the sharply defined policy of South Carolina, citing section 16-570 of the Code of that state, which prohibits "Giving or taking bribes, etc., to or by certain agents, servants or employees." For the reasons stated by the District Court for the Eastern *162 District of South Carolina in the case of Fiambolis v. United States, - Fed. Supp. - (Civil Action No. 4078, Opinion filed June 21, 1957), this argument is rejected. Since the other adjustments made by respondent in the individual income tax liabilities of Eugene and J. W. for the years 1942 to 1945, inclusive, were in small amounts and related to questions innocuous from the standpoint of fraud (except perhaps the adjustment considered by us and decided in favor of petitioners, which is hereinafter discussed under "Issue 5"), and since the respondent predicates his argument that petitioners' individual income tax returns were fraudulent on his contention that petitioners failed to include therein the large amounts of unrecorded receipts which petitioners contend were used to pay commissions, our conclusions on these issues, Nos. 1, 2, and 3, will result in barring any deficiencies in the individual income taxes of Eugene and J. W. for the years 1942 through 1945, due to the operation of the statute of limitations. Issue 4 The respondent multiplied the closing inventory of the corporation for the fiscal year 1942 by 35 times. He made similar adjustments in the opening and closing *163 inventories for the fiscal years 1943 through 1945, and in the opening inventory for the fiscal year 1946. The closing inventory for the fiscal year 1946 and the opening and closing inventories for the fiscal years 1947 and 1948 were multiplied by 25. It is petitioners' contention that the value of the inventory was correctly stated and that respondent erred in making these adjustments. We are in accord with petitioners' contention. From the record, it is apparent that most of the items in the firm's inventory for the years here in question had been there for some time. A good deal of the inventory had been purchased by Eugene for the firm from the United States Government during its surplus sales after World War I. These slow-moving items were subject to obsolescence and damage caused by deterioration and waterfront rodents. The method used by the firm to ascertain the extent of its inventory was adequate for its purposes, although not the best method available. The firm kept no book record of the items that made up their stock nor did it keep any record pertaining to their value. It relied each year on a new physical count of items. There is no evidence, however, that this method *164 resulted in erroneous valuations. The accuracy of the employees' count was not questioned. Eugene's vast experience in the field and his everyday knowledge of business conditions qualified him to place reasonable values on the inventory. In his determination, respondent did not question Eugene's qualifications, nor did his agents inspect the inventory or the purchase invoices therefor, although both were available. Respondent's agents relied on statements made by Eugene as to the value of the inventory when he purchased it from the Government after World War I, without taking into account its salability after remaining in storage for many years, its possible obsolescence, and its current physical condition. There is no explanation given by respondent's agents for the shift in adjustment made in 1946. Before that year, they determined that the value of the inventory was understated by 35 times, after that year by 25 times. During the years in question, with the exceptions of 1946 and 1948, the book value of the inventory varied less than $100. In 1946 the firm more than doubled its inventory, increasing it from $989.75 to $2,110.50, and in 1948 the firm increased its inventory from *165 $2,176.46 to $2,641. The respondent's determination results in major increases in closing inventory and therefore decreases in the cost of goods sold in the years 1946 and 1948. This is caused by multiplying the opening and closing inventory, including the increases, by 25. Thus, the shown increases in closing inventories in 1946 and 1948 of $1,120.75 and $464.54 are determined by respondent to be $18,121.25 and $11,613.50, respectively, resulting in decreases in cost of goods sold of $17,000.50 and $11,148.96, respectively. There is nothing in the record to substantiate these numerical increases. It is our opinion that petitioners have introduced sufficient evidence to overcome the presumption of correctness in the respondent's determination. After carefully considering the entire record, we conclude that the inventories were correctly stated on the firm's tax returns and that respondent erred. His apparently arbitrary use of the multipliers 35 and 25 resulted in an incorrect determination. It is clear from the record that the firm's inventory was not the major source from which orders were filled. It is also clear that this slow-moving inventory was worth no more than stated in *166 the firm's tax returns. Issue 5 In his determination of deficiencies in tax of Eugene and J. W. for the 7 years in question, respondent added $1,000 per year to each petitioner's income representing "the estimated value of groceries and merchandise taken from stock and for payments for other purchases for the personal use of [Eugene and J. W.] * * *." Petitioners contend that respondent's determination was incorrect. After a careful review of all factors pertaining to this issue, we are unable to agree with respondent's determination. The only evidence in the record pertaining to this issue was introduced by petitioners. Their evidence indicates that purchases of merchandise of a personal nature were made at the request of individual crew members of foreign ships. It was the custom for Eugene to advance the funds for these purchases. When the merchandise was received on board the ships, the purchase price was paid to Eugene by the ship's steward. Petitioners' witnesses also testified that the firm had no inventory of groceries or produce after 1940. The firm purchased groceries as orders were received from ships. Most of the groceries so ordered were delivered directly to *167 the dock and then transported to the ship. Those items which were delivered to the firm's premises were taken directly to the dock by the firm's trucks. Respondent introduced no evidence on either point. On brief, he urges us to disregard the testimony adduced at the hearing and affirm his determination. Although Eugene's statements may be taken as self-serving, they are corroborated by the testimony of the firm's employees. Respondent made no attempt to rebut any of this testimony. In view of the failure of respondent to support his determination with any credible evidence, we conclude that petitioners have overcome the presumption of correctness of the respondent's determination, and that no part of any inventory or purchases of groceries or merchandise was diverted to the petitioners' personal use without such diversion being duly recorded on the firm's books and on the individual's tax return as such. Issue 6 In his determination, the respondent has disallowed a deduction taken by the corporation on its return for the fiscal year 1944 in the amount of $2,500. Respondent contends that this amount, due to C. L. Vann, the corporation's accountant, was a contingent liability, *168 to be paid only if the corporation received a refund of taxes on its section 722 claim which was prepared by Vann. Petitioners argue that the debt was in no way contingent, that it became a fixed and certain obligation of the corporation during its fiscal year 1944, and is therefore a proper deduction. The burden of proving that the respondent's determination is erroneous is upon the petitioners. In our opinion, they have sustained this burden. Appearing as a witness for the respondent, Vann was asked on cross-examination whether or not his fee was contingent upon recovery on the claim by the corporation. His answer was "Absolutely not." He was positive in his assertion that this fee was a fixed and definite amount owing to him, with no taint of contingency involved. The only rebuttal evidence introduced by respondent was contained in the testimony of one of the revenue agents who had worked on the case. The agent testified that during a conference between Eugene and himself, at the firm's place of business, Eugene had said that the fee was not payable until the corporation received a refund under the claim. The agent's recollection of the conversation was rather cloudy. He set *169 the date as either October or November of 1948. He could not recall who was present, other than Eugene and himself. Neither party put the question to Eugene when he testified. Upon the record before us, we are satisfied that at the time this expense was accrued on the corporation's books and the deduction taken the fee was a fixed and definite liability. Issues 7 and 8 Although consents waiving the statute of limitations were filed for the corporation for all the years here in question, no consents were filed by Eugene either as an individual or as executor of J. W.'s estate for the years 1942 through 1945, inclusive. Therefore, our determinations under Issues 1, 2, 3, and 4, resulting in a conclusion that there were no deficiencies in income, excess profits, and declared value excess-profits taxes for the corporation, render unnecessary any discussion of Issue 7. Similarly, our conclusion that no part of any deficiencies in tax for Eugene and J. W. prior to 1946 was due to fraud with intent to evade tax renders unnecessary any discussion of Issue 8. Issue 9 In an amendment to his answer respondent claimed further additions to tax for alleged understatement of the estimated *170 taxes of Eugene and J. W. for the year 1947 under section 294(d)(2) of the 1939 Code. Petitioners question the correctness of this determination and point out that respondent has the burden of proof on this issue. Eugene and J. W. both filed timely declarations of estimated income tax for 1947 and made timely payments thereon. These final returns for 1947 were filed on January 9, 1948, and, under section 58(d)(3), acted as amendments of the declarations. The correctness of respondent's determination depends on whether 80 per cent of each petitioner's correct tax liability exceeds the estimated tax paid, taking into consideration the filing of their tax returns before January 15, 1948. There must be recomputations of the correct tax liability of both Eugene and J. W. under Rule 50. At that time, whether or not section 294(d)(2) applies will be ascertained by the parties and they will comply with the provisions of the pertinent sections. Issue 10 Respondent disallowed certain deductions and credits claimed by Eugene and J. W. for the years 1942 through 1946, and added certain capital gains to Eugene's income for 1945, 1946, and 1947. The petitions filed by Eugene and J. W. (through *171 Eugene as executor) put all of these determinations in controversy. Petitioners neither introduced any evidence on these issues nor argued them in their brief. In their reply brief, petitioners admitted that these determinations were not contested. They will be given effect in the Rule 50 recomputation insofar as they are not barred by the statute of limitations. Decisions in Docket Nos. 47539 47540, and 59765 will be entered under Rule 50. Decision in Docket No. 48256 will be entered for the petitioners. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Eugene Richardson, Docket No. 47540; Eugene Richardson and Anna W. Richardson, Docket No. 48256; Estate of J. W. Richardson, Deceased, Eugene Richardson, Executor, Docket No. 59765.↩
*. Income and Victory tax. ↩
2. Partial payments of the deficiencies were made prior to the filing of the petition in this case. The deficiencies listed are only the balances unpaid. The 293(b) additions to tax are calculated on the total deficiencies.↩
3. See footnote 2, supra.↩